IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTIAN T. ALVAREZ, ) | No. C 10-5744 RMW (PR) |
| ) | |
| Petitioner, ) | ORDER DENYING PETITION FOR |
| ) | WRIT OF HABEAS CORPUS; |
| v. ) | DENYING CERTIFICATE OF |
| ) | APPEALABILITY |
| WARDEN M.D. MCDONALD, ) | |
| ) | |
| Respondent. ) | |

Petitioner, a state prisoner proceeding pro se, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the petition should not be granted. Respondent has filed an answer addressing the merits of the petition. Although given an opportunity, petitioner has not filed a traverse. Having reviewed the briefs and the underlying record, the court concludes that petitioner is not entitled to relief based on the claims presented and DENIES the petition.

**BACKGROUND**

Kamar Allen and Henriante Livingston were students together in high school, and worked at the Pittsburg Community Center.[1] (Resp. Ex. 7 at 2.) After Allen was fired from the

---

[1] The facts of this case are taken from the California Court of Appeal's opinion in People v. Alvarez, No. A121959, 2010 WL 1636188 (Cal. Ct. App. April 23, 2010). (Resp. Ex. 7.) The court is only summarizing the most relevant facts to the claims presented in petitioner's

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\RMW\HC.10\Alvarez744denhc.wpd

community center in November 2007, he and several other friends returned to the community center and stole a Playstation gaming console plus two controllers. (Id.) Later that day, Livingston visited Allen's house with Devance Battle, another teenager. (Id.) Battle asked Allen to return the gaming system, and Allen did so, with the understanding that Battle would not tell anyone. (Id.)

On December 10, 2007, Battle and Livingston confronted Allen at school because the Playstation gaming controllers were agin stolen from the community center. (Id.) Allen tried to convince them that he did not take them. (Id.) Tensions were rising, and the three boys were taken to the principal's office. (Id.) While there, Allen accidentally dropped a knife that he had kept hidden in his sweatshirt pocket. (Id.) Battle believed Allen was trying to cut them, and Livingston began to choke Allen. (Id.) Livingston punched Allen a few times, and both were suspended from school. (Id. at 3.)

Allen went to his friend, Anthony Combs', house. (Id.) Allen called Livingston's cell phone and threatened him. (Id.) Allen then called Combs and told him what had happened. (Id.) Allen then heard Battle and Livingston outside of Combs' house, speaking with Combs' grandmother. (Id.) Allen called Combs to let him know. (Id.) Combs told Allen that he would send someone over for protection and told Allen to wait outside. (Id.)

As Allen was waiting, "Christian," who Allen identified as petitioner, arrived at the house in a blue 1983 or 1985 Chrysler or similar-type car. (Id.) Allen had recognized petitioner as someone he had seen many times before. (Id.) Allen got into the passenger seat, and petitioner drove to Allen's apartment complex. (Id.) Allen had told petitioner about his altercation with Battle and Livingston. (Id.) Allen saw Battle and Livingston standing near the apartment complex, and when petitioner asked, "Is that them?", Allen responded that it was. (Id.)

Petitioner drove up next to Battle and Livingston, and attempted to cover his face

---

petition.

partially with his coat. (Id.)   Allen saw a black revolver in petitioner's hand. (Id.)  Petitioner pointed the gun out of the window, and Battle and Livingston both began running. (Id.) Petitioner fired his gun two or three times in their direction. (Id. at 3-4.)

At trial, petitioner testified on his own behalf, stating that in December 2007, he was "between houses," and often stayed at Combs' house. (Id. at 6.)  He also sometimes stayed with a man named Jethro at 223 West Boulevard in Pittsburg. (Id.)  Petitioner denied having his cell phone with him on December 10, 2007. (Id.)  Petitioner also denied having driven a blue American-type car, or having access to such a car in December 2007. (Id.)  Combs' mother and Combs' girlfriend testified on petitioner's behalf, stating that he was with them virtually all day and night on December 10, 2007. (Id. at 7.)

In rebuttal, Detective Reposa testified that 223 West Boulevard was not an actual street address. (Id.)  Rather, 223 West Boulevard was a marker on a telephone pole on West Boulevard, and it had been adopted by a group of criminals in that area. (Id.)  Officer Hynes testified that on December 11, 2007, he found a 1993 blue Ford Taurus with petitioner sleeping inside of it. (Id. at 8.)  Petitioner had possession of the car keys, as well as a cell phone, which petitioner said belonged to him. (Id.)

On May 29, 2008, petitioner was convicted by jury for two counts of attempted murder, and two counts of discharging a firearm from a motor vehicle.  On June 20, 2008, the trial court sentenced petitioner to a term of 52 years 4 months to life in state prison.  On April 23, 2010, the California Court of Appeal affirmed.  On July 28, 2010, the California Supreme Court denied review.  Petitioner filed the instant federal petition on January 10, 2010.

## DISCUSSION

**A.      Standard of Review**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\RMW\HC.10\Alvarez744denhc.wpd

may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, Williams v. Taylor, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if the state court correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340.

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir. 2000). Here, that decision is from the California Court of Appeal.

**B.    Petitioner's Claims**

As grounds for federal habeas relief petitioner claims that: (1) the trial court erred in admitting irrelevant and prejudicial criminal gang evidence, and (2) the trial court erred by giving the jury an incomplete and confusing jury instruction on attempted murder.

    1.    Admission of criminal gang evidence

Petitioner claims that Detective Reposa's rebuttal testimony regarding 223 West Boulevard implied that petitioner was involved with a criminal gang. Petitioner asserts that admission of this testimony violated his right to due process because it was irrelevant, and more prejudicial than probative.

The California Court of Appeal summarized the parties' conversation at the bench following Detective Reposa's testimony at trial.

> Following Reposa's testimony and out of the jury's presence, the parties and the court discussed Reposa's testimony. The trial court first stated: "I'd like to have us summarize some of our discussions off the record.
>
> "First of all, why don't we talk about Detective Reposa's testimony yesterday regarding that street address that's really a pole. Well, I'll try to summarize.
>
> "I believe that Ms. Smith [the prosecutor] indicated she wanted to use that impeachment because it was not a street address, a real home address. And she wanted it to come in to impeach the defendant and also to show that he was sort of identifying with a criminal neighborhood. She wanted to use the words that it was a gang, a known gang reference.
>
> "And Miss Mockler [defense counsel] objected to the reference regarding gang because she thought it was more prejudicial than probative. I agreed and asked Miss Smith or instructed Miss Smith to have her witness refer to criminal activity.
>
> "Then when the officer testified, he went beyond just criminal activity and referred to affiliation and claiming that territory. And I know Ms. Mockler would have objected to that. However, I don't think we need to address it, because the officer did not use the gang language. And I'm not sure that the jurors are savvy enough to even understand that 'claiming' and 'affiliation' refers to gang issues.
>
> "So I would leave it as is. Does anyone want to say anything about that?"
>
> Defense counsel responded: "I do. When we talked in chambers [before Reposa testified], we talked at length about this issue. And it was agreed upon that Detective Reposa would talk in terms of people associated that specific location with criminal activity. I think that what he ended up testifying to is the

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\RMW\HC.10\Alvarez744denhc.wpd

5

same thing as saying gang activity, except he didn't use the word gang.

"I did not object at the time that the testimony came out, because I did not want to highlight his testimony and make matters worse on the record. I am objecting now, making a motion to strike that part of his testimony and, for the record, making a motion for a mistrial."

The prosecutor then responded: "I personally don't believe that the officer stepped outside of the bounds. We discussed at length in chambers. And during that particular conversation I indicated to the Court that in order to be able to understand and explain this particular street post, there would have had to have been some reference to the fact that criminal activity or criminals associated with that particular area would have to and do affiliate with that particular post. After explaining that, we went into length about the fact that we couldn't use the word gang. And I tried different versions of that. And I think the Court's recommendation was criminal street activity. I think the defense position was that he could associate thugs with that particular post.

"And I think the testimony, as given, was innocuous enough. And, in fact, we didn't go into extensive criminal activity within that particular area. He was innocuous enough that a jury would not have found that it was related to gang activity, but more that people associate from that particular area around that light post. And I do not believe the officer crossed over the line at all.

"I did instruct him not to use the word 'gang.' I did instruct him according to what the Court said about criminal activity within that area or criminal activity affiliated with that particular address. And I believe the officer stayed within his bounds. I think based on that and the fact that there's no prejudicial value for what came in, that a mistrial should be denied and the testimony should not be stricken."

The court then stated it would allow the testimony to stay in and denied the mistrial, explaining: "Although I didn't anticipate the officer discussing 'affiliation,' which sounds more gang-like, he didn't talk in terms of 'gang.' And it was within the scope of criminal activity. And I don't find what the officer testified to be more prejudicial than probative. So I'll allow it to stand."

(Resp. Ex. 7 at 15-16.)

The California Court of Appeal analyzed this claim in terms of state law, and determined that the trial court did not abuse its discretion in concluding that the testimony was not more prejudical than probative. (Id. at 17-18.) The state appellate court concluded that although Detective Reprosa used the words "affiliation" and "claiming" in describing the significance of 223 West Boulevard, the officer did not use the word "gang," and thus, stayed within the confines of the limits set by the court and the parties. (Id. at 18.) "Although the officer briefly used words that could perhaps be interpreted to apply to gang members, the words did not

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\RMW\HC.10\Alvarez744denhc.wpd

6

unambiguously refer to gang membership and therefore did not stray from the purpose of the testimony: to impeach appellant and to identify him as the shooter in this case.  The court acted within its broad discretion when it found this evidence relevant and, hence, admissible." (Id.)

     The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986).  Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  See Henry, 197 F.3d at 1031.  The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir.1995). Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.  See Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). Here, as the state appellate court concluded, Detective Reposa's testimony was relevant to impeach petitioner's testimony that he lived with "Jethro" at 223 West Boulevard, and also provided evidence showing that petitioner was the shooter because he was described by Allen as someone who hung out on West Boulevard.

     Moreover, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established federal law under 28 U.S.C. § 2254(d)).  Because there is no Supreme Court precedent that controls on this legal issue, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law.  *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

2.    <u>Jury instruction error</u>

Petitioner argues that the trial court failed to give complete instructions on attempted

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\RMW\HC.10\Alvarez744denhc.wpd

murder, and specifically, failed to define the term "kill zone." Petitioner argues that the trial court's instruction was incomplete and confusing.

At trial, the court instructed the jury on attempted murder with a shortened version of CALCRIM No. 600:

> The defendant is charged in Counts 1 and 2 with attempted murder. To prove that the defendant is guilty of attempted murder, the People must prove that: One, the defendant took at least one direct, but ineffective step towards killing another person; and, two, the defendant intended to kill that person.
>
> A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous attempt to kill. It is a direct movement towards the commission of a crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.
>
> A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or kill zone."[2]

In rejecting petitioner's claim the California Court of Appeal concluded, first, that petitioner waived this claim by failing to contemporaneously object to the instructional omission. (Resp. Ex. 7 at 20-21.) Nonetheless, the California Court of Appeal rejected the claim on the merits, reasoning:

> In People v. Bland (2002) 28 Cal.4th 313, 329 our Supreme Court discussed the concurrent intent or "kill zone" theory of attempted murder, pursuant to which "the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within . . . the 'kill zone.'" (Citing Ford v. State (Md. 1993) 625 A.2d 984, 1000-1001.) In such a situation, "'[t]he defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably

---

[2] The rest of CALCRIM No. 600, which the trial court did not read, is as follows: "[A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of [the victim under concurrent intent theory], the People must prove that the defendant not only intended to kill [the primary target alleged] but also either intended to kill [the victim under concurrent intent theory], or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill [the victim under concurrent intent theory] or intended to kill [the primary target alleged] by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [the victim under concurrent intent theory]."]

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\RMW\HC.10\Alvarez744denhc.wpd

8

infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.'" (Bland, at p. 330.)

. . .

We do not believe appellant's substantial rights were affected by the instruction given in this case. First, our Supreme Court has stated that the "concurrent intent" or "kill zone" theory "is not a legal doctrine requiring special jury instructions, as is the doctrine of transferred intent. Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (Bland, supra, 28 Cal.4th at p. 331, fn.6; accord, People v. Stone (2009) 46 Cal.4th 131, 137 (Stone).) Moreover, the "'Bench Notes' to CALCRIM No. 600 explain that Bland stated that a special instruction on the point is not required, and that the kill zone 'language is provided for the court to use at its discretion.'" (Stone, at pp. 137-138.)

In view of the discretion the trial court had regarding whether to use the "kill zone" language at all, we conclude that the partial instruction given here on the "kill zone" theory was not misleading. The language of the instruction as given sufficiently explained the concept, including the requirement that appellant intended to kill anyone within the kill zone. [FN14.] Also, the jury was instructed with CALCRIM No. 103 regarding the presumption of innocence and the requirement that appellant's guilt be proven beyond a reasonable doubt. We find it difficult to imagine that, without the additional reasonable doubt language in CALCRIM No. 600, the jury presumed that the kill zone theory of attempted murder was the sole, and unstated, exception to the overarching reasonable doubt requirement.

> FN14. In Stone, supra, 46 Cal.4th 131, our Supreme Court observed that CALCRIM No. 600 "refers to the intent to kill 'anyone' within the kill zone rather than 'everyone.' In context, a jury hearing about the intent to kill anyone within the kill zone would probably interpret it as meaning the intent to kill any person who happens to be in the kill zone, i.e., everyone in the kill zone. But any possible ambiguity can easily be eliminated by changing the word 'anyone' to 'everyone.'" (Id. at p. 138, fn.3.) Like the court in Stone, we believe that the jury here likely interpreted the word "anyone" to mean " any person" in the "kill zone," particularly since there were only two people in that zone.

In addition, during her closing argument, the prosecutor discussed how CALCRIM No. 600 applied to the facts of this case, accurately describing the "kill zone" theory. She began by emphasizing that specific intent to kill is an element of attempted murder, further stating, "I do have to prove to you that the defendant, with express malice aforethought, chose to kill Henriante Livingston and Devance Battle." She then stated that the jury could reach that conclusion in one of two ways.

She first explained that appellant could have separately targeted each victim, based on the evidence presented at trial: "[W]hen he turned and pointed the weapon out the window, first at Devance Battle, his intent at that particular time was to kill Devance Battle. And as soon as Devance Battle started running, he turned the weapon to Henriante Livingston. And in his mind his

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\RMW\HC.10\Alvarez744denhc.wpd

9

target changed from Devance Battle to Henriante Livingston. And at the time that he began firing that trigger, boom, boom, he intended to kill Henriante Livingston." Under this theory, the prosecutor explained, appellant "individually thought in his mind at different times when the gun was pointing at one particular person, I'm gonna kill you. I'm gonna kill you."

The prosecutor also argued, alternatively, the "kill zone" theory: "I can prove that the defendant may have intended to kill anyone in a particular zone of harm or kill zone when he intended to kill a particular person. What do I mean? Well, I can prove that the defendant intended to kill a particular person, that is Henriante Livingston[, while] Devance Battle [was] standing in the kill zone. So I can prove to you that when the defendant went out there and he had that revolver in his hand and he was shooting out the window at Henriante Livingston, in his mind what he was thinking is I'm going to kill Henriante Livingston and if anybody is within that kill zone that gets in my way for me to kill Henriante Livingston [sic]. The law allows you to say he intended to kill whoever else was in that kill zone as well, Devance Battle. [¶] You can find it the other way, when the defendant pulled the revolver out of his lap, pointed it directly out the window and, as Kamar Allen stated, at Devance Battle first, what was running through his mind is I'm gonna kill Devance Battle. And you can find, based on that, that he knew the circumstances that Henriante Livingston was standing so close to Devance Battle, his intended target, that he had the specific intent to kill anyone standing in that zone of danger, that kill zone."

The prosecutor's argument correctly described the "kill zone" theory and applied it to the facts of this case. Importantly, she made clear that appellant had to have specific intent to kill each victim under any theory. This case is thus distinguishable from People v. Anzalone (2006) 141 Cal. App. 4th 380, 392, in which the trial court exercised its discretion to leave out the "kill zone" portion of CALCRIM No. 600, which "totally [left] to the prosecutor the defining of that legal concept. In this case the prosecutor got it wrong." The prosecutor erroneously told the jury that anytime persons are within a zone of danger, "the indiscriminate firing of a shot at those persons amounts to an attempted murder of everyone in the group. The prosecutor did not explain what constitutes a 'zone of danger' or how such a zone relates to the element of intent ." [FN15.]  (Ibid.)  Here, on the other hand, the trial court tied the term "kill zone" with the requirement that appellant had to have specific intent to kill each person within that zone, and the prosecutor correctly applied the "kill zone" theory to the circumstances of the case. [FN16.]

> FN15. We also note our Supreme Court's clarification in Stone, supra, 46 Cal.4th 131, 140, that "a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person."

> FN16. We also observe that substantial evidence was presented at trial that both Livingston and Battle were appellant's intended victims. Allen testified that he had told appellant about his altercation with the two young men and about them showing up at Combs's house. Then, as they approached Livingston and Battle near the apartment complex,

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\RMW\HC.10\Alvarez744denhc.wpd

> appellant asked Allen, "Is that them?" and Allen said yes. There is also evidence – in the form of Allen's and Livingston's testimony and, especially, Livingston's preliminary hearing testimony, which was read into the record at trial – that appellant first shot at Battle as he ran away. Thus, it is quite likely the jury found that appellant planned to kill both Livingston and Battle, rather than that Livingston was the sole targeted victim and that his intent to kill Battle was based solely on his presence in the "kill zone." (See People v. Smith (2005) 37 Cal.4th 733, 741 ["'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill"'"].)
>
> In conclusion, given the instructions, evidence, and argument presented to the jury at trial, it is not reasonably probable that the court's failure to instruct the jury with the entirety of CALCRIM No. 600 changed the result in this case. (See Mitchell, supra, 164 Cal. App. 4th at p. 465, citing People v. Watson, supra, 46 Cal.2d 818.) Accordingly, because the instruction, as given, did not affect appellant's substantial rights, his failure to object in the trial court forfeited any claim of error. (See Mitchell, at p. 465.)

(Resp. Ex. 7 at 19-24.)

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle v. McGuire, 502 U.S. at 62, 72 (1991). The challenged instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See id. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)). The relevant inquiry is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a manner that prevents the consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 380 (1990).

As an initial matter, the state court ruled that the kill zone instruction adequately sets forth California law regarding the offense; that decision is binding on this court. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005). Further, here, it is not reasonably likely that the jury applied the instruction in a way that violated the Constitution. The jury was instructed as to the elements of attempted murder, including specific intent; the prosecutor correctly presented the "kill zone"

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\RMW\HC.10\Alvarez744denhc.wpd

11

1  theory; and the jury was reminded that it was to follow the law as instructed by the court. The
2  jury is deemed to have followed these instructions, see Weeks, 528 U.S. 225, 234 (2000), and
3  when considering the jury instructions in the context of the whole trial rather than in artificial
4  isolation, the jury instructions did not violate petitioner's due process rights. See Estelle, 502
5  U.S. at 72.

6  Moreover, even if the instruction as given was erroneous, there was no prejudice.
7  Instructions that lessen the prosecution's burden will be subject to harmless error review, rather
8  that structural error review, "unless all the jury's findings are vitiated." Byrd v. Lewis, 566 F.3d
9  855, 866 (9th Cir. 2009) (finding application of harmless error analysis of a defective jury
10 instruction was proper because the instructional error was only with respect to one element and
11 did not vitiate the jury's finding of guilt on the charged offense). As the state court recognized,
12 the record shows that there was substantial evidence that petitioner intended to kill both victims.
13 (Resp. Ex. 7 at 24, n.16.)

14 Given the high deference accorded to the state appellate court's analysis here, the state
15 court's rejection of this claim was not contrary to, or an unreasonable application, or clearly
16 established Supreme Court law.

## CONCLUSION

18 The petition for a writ of habeas corpus is DENIED. The federal rules governing habeas
19 cases brought by state prisoners require a district court that denies a habeas petition to grant or
20 deny a certificate of appealability ("COA") in its ruling. Petitioner has failed to make a
21 substantial showing that his claims amounted to a denial of his constitutional rights, or
22 demonstrate that a reasonable jurist would find the denial of his claims debatable or wrong.
23 Slack v. McDaniel, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

24 The clerk shall enter judgment and close the file.

25 IT IS SO ORDERED.
26 DATED: __FFEGJETH__
                                          *Ronald M. Whyte*
27                                        RONALD M. WHYTE
                                          United States District Judge
28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\RMW\HC.10\Alvarez744denhc.wpd

12

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

CHRISTIAN T ALVAREZ,

        Plaintiff,

  v.

STATE OF CALIFORNIA et al,

        Defendant.
                                           /

Case Number: CV10-05744 RMW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on August 27, 2012, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Christian T Alvarez G-22117
D-4/Cell-138
PO Box 4670
Lancaster, CA 93539-4670

Dated: August 27, 2012

                                          Richard W. Wieking, Clerk
                                          By: Jackie Lynn Garcia, Deputy Clerk